UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| BELLSOUTH TELECOMMUNICATIONS, LLC | : | Case No. 3:16-cv-00124-TBR |
| | : | |
| *Plaintiff,* | : | BRIEF *AMICUS CURIAE* OF |
| | : | FRONTIER COMMUNICATIONS |
| v. | : | CORPORATION IN OPPOSITION TO |
| | : | LOUISVILLE/JEFFERSON COUNTY |
| | : | METRO GOVERNMENT'S MOTION TO |
| LOUISVILLE/JEFFERSON COUNTY | : | DISMISS THE COMPLAINT |
| METRO GOVERNMENT, | : | |
| | : | |
| *Defendant.* | : | |

Frontier Communications Corporation ("Frontier") respectfully submits this brief *amicus curiae* in opposition to the motion of Defendant, Louisville/Jefferson County Metro Government ("Louisville Metro"), to dismiss the complaint. The purpose of this brief is twofold: **first**, to explain the nationwide ramifications of this case for non-parties such as Frontier in the telecommunications industry, and **second**, to address Louisville Metro's erroneous argument that this Court lacks jurisdiction to rule on the First Claim for Relief claim brought by BellSouth Telecommunications, LLC ("AT&T"), which requests a ruling that Ordinance No. O-427-15 (the "Ordinance") is preempted by operation of the Pole Attachment Act, as amended (47 U.S.C. § 224).

### Interest of *Amicus Curiae*

Frontier owns telecommunications companies throughout the country, with a total of approximately 19,200 employees in twenty-nine States.[1] As an owner of Incumbent Local

---

[1] Although Frontier does not presently operate in Kentucky, it has a significant presence in many States that adjoin the Commonwealth and in States located in the Sixth Circuit.

Exchange Carriers ("ILECs"), Frontier provides telephone, internet and television services to approximately 3.4 million customers and 2.5 million broadband subscribers.[2] Frontier has grown to be the fourth largest ILEC in the United States. It has done so through both organic growth and acquisitions, including a recently completed purchase of wireline operations in a number of large-population States from Verizon Communications, Inc.

Frontier strives to be the leader in providing communications services to residential and business customers in its markets. It is committed to delivering innovative and reliable products and solutions with an emphasis on convenience, service and customer satisfaction. Frontier offers a variety of voice, data and video communications options on a stand-alone basis and as bundled or packaged solutions. These services are delivered through means that include wireline transmission on literally hundreds of thousands of telephone poles owned, operated and maintained by Frontier and others throughout the country. As a result Frontier is very familiar with federal law governing utility pole attachments, including the Pole Attachment Act and related regulations of the Federal Communications Commission ("FCC") as well as state statutes and local ordinances concerning this subject.

Frontier has no affiliation with AT&T and is receiving no financial assistance from AT&T for the filing of this brief. Nor has the submission of this brief been solicited by AT&T. Frontier has no vested monetary interest in the immediate outcome of this case. Yet, the issues raised by the case may have important implications for Frontier's business and may impact the development

---

[2] In addition to telephone and other ILEC services, Frontier's operating telephone companies offer broadband internet, digital television services, and computer technical support to residential and business customers. For sake of simplicity, those companies are also jointly referred to as "Frontier".

of law in jurisdictions throughout the country where Frontier operates. This *amicus* brief was not solicited by AT&T.

In adjudicating this case the Court should bear in mind the concerns of Frontier and others who seek predictability in the application and enforcement of law regulating the telecommunications industry, particularly when there is serious risk that federal law, or a state statute or regulation that governs by operation of reverse preemption,[3] will be undermined by implementation of conflicting mandates of municipalities and other local governments. If the challenged Ordinance is upheld, it is likely that Louisville will not be alone amongst cities in enacting such utility-pole-attachment regulation. ILECs such as Frontier have a strong interest to ensure that local pole-attachment ordinances comply with federal law and any governing state law and are interpreted and enforced in a uniform and consistent manner. Frontier is especially interested in the outcome of this litigation in light of the recent substantial expansion of its wireline services through the Verizon transaction noted above. The Court's review of the Ordinance as it relates to preemption issues could have a discernable impact on the development of law in this area, which in turn may impact Frontier's ability to protect its recent investments and other assets and to control the appropriate and efficient use of that property for the benefit of Frontier's customers.

---

[3] Under section 224 (c) of Telecommunications Act of 1996, which amended the Pole Attachment Act, a State that has met certain requirements and has properly certified such compliance may implement certain regulations under the so-called "reverse preemption" doctrine. *See* 47 U.S.C. 224(c). Frontier understands that one of the issues in this case may be whether Kentucky has satisfied the requirements for reverse preemption such that pole-attachment regulations of the Kentucky Public Service Commission ("PSC") apply. Regardless of the application of reverse preemption, the Ordinance should be preempted because it conflicts with both FCC and PSC regulations governing pole attachments.

## Argument

I. **THIS CASE IS OF NATIONWIDE IMPORTANCE TO FRONTIER AND OTHERS CONCERNED ABOUT THE UNIFORM DEVELOPMENT AND APPLICATION OF LAW GOVERNING UTILITY POLE ACCESS WITHOUT SUCH LAW BEING UNDERMINED BY CONFLICTING LOCAL LAW MANDATES**

As the owner of ILECs throughout the country, Frontier closely monitors the various statutes and ordinances enacted nationwide regarding the rights and responsibilities of owners and users of utility poles. Frontier seeks to comply with all such regulation; however, it is important to address and challenge inconsistencies in local governing rules where they conflict with federal and any governing state requirements. It is of paramount concern that utility-pole access be consistent to the greatest extent consistent with applicable law under the Pole Attachment Act to allow proper use of, and a reasonable investment return on, assets necessary to deliver communications services for the benefit of all consumers.

The Ordinance at issue in this case – adopted by Louisville Metro on February 11, 2016, to amend § 116.72 of the Louisville Metro Code of Ordinances Regarding Communications Services Franchises – constitutes a marked change in approach to utility-pole access rules in comparison to regulations enacted by other jurisdictions. Although cities around the country have adopted ordinances that address a third-party's right to attach equipment to utility poles, the Ordinance is unprecedented: it drastically expands the rights of third parties to use privately owned utility poles, giving non-owners unfettered access to an ILEC's (or utility's) property without the ILEC (or utility) in some cases even having knowledge that such third-party intrusion on its facilities is occurring.

Section II(D)(2) of the Ordinance permits third parties to attach equipment to privately owned utility poles, and if necessary, remove, alter and relocate current equipment and facilities. Further, the Ordinance expressly permits third parties to conduct this work without prior notice to

either the owner or an existing attacher if the third party believes the work will not "cause[] or would be reasonably expected to cause a customer outage." If an outage will occur or is reasonably expected, the third party is still permitted to conduct the work as long as it provides thirty days' notice to the utility pole's owner.

The Ordinance strips the utility pole owner of the right to negotiate key terms of access that are designed to minimize disruption and delay to the consumer. These terms not only protect the public, but they also safeguard the pole owner's rights and equipment, as well as the rights and equipment of already existing attachers.

The Ordinance's adverse impact on consumer welfare may be substantial. It completely transfers decision-making as to whether to remove, alter and relocate the components of the utility pole owner's equipment and network from the owner to a totally unrelated third party having obviously less familiarity with the owner's property. This transfer of power increases the risk that the attachment work will not be done appropriately and correctly. Although the Ordinance purports to protect against service outages to the ILEC's (or utility's) customers caused by the third party's invasive acts, it puts control over dislocation squarely in the hands of not the ILEC (or utility) – the party that owns and is most familiar with the affected equipment and network and that is responsible for maintaining 911 and other vital services to consumers, hospitals, fire, police, other government agencies and businesses – but rather a third party with less such knowledge and far less incentive to keep the ILEC's (or utility's) existing customers happy. If telephone and cable service goes out as a result of the third party's intrusion on a utility pole, one can be sure that an angry consumer will contact his or her telecommunications supplier first, not the unrelated third party that caused the harm. And for many dissatisfied customers, it will be viewed as a poor excuse for the ILEC to answer that it was the third party's fault that service was disrupted and that, because

of local law, the ILEC had no control over the third party's installation mistakes and missteps that caused the problem.

In many cities around the country, utility pole owners and third parties have avoided pole access errors by reaching consensual agreement on pole attachment issues. By enacting the Ordinance, however, Louisville Metro has bestowed unwarranted and unprecedented benefits on companies that made no investment in the utility poles, yet seek unfettered access to those poles without having to be bothered by the normal give-and-take of the negotiation process that takes place with the owner for rights of access. The Ordinance thus bestows "corporate welfare" on strangers to occupy another's property without appropriate compensation. It displaces the ability of utility pole owners to enter into contracts with third parties that best protect service to customers and ensure a fair return on the owners' investment, which is already regulated by the FCC through the Pole Attachment Act or through state regulation that governs through operation of reverse preemption. *See* 47 U.S.C. § 224(b)(1), (2) (authorizing the FCC to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable" and directing the FCC to "prescribe by rule regulations to carry out the provisions of this section"); 47 U.S.C. § 224(c) (providing for state regulation if certain conditions are met).[4]

---

[4] As of July 12, 2011, the FCC held that ILECs, such as AT&T and Frontier, "are entitled to rates, terms, and conditions [for pole attachments] that are 'just and reasonable' in accordance with [47 U.S.C.] section 224(b)(1)." Pole Attachment Order, 26 FCC Rcd at 5240, 5330 (¶¶ 202, 208). Indeed, the FCC has confirmed that ILECs have the right to just and reasonable rates in private negotiations, arbitration, or litigation – without FCC proceedings. Thus, the Pole Attachment Order provides specific guidance about the calculation of just and reasonable rates in order to "reduce the number of disputes for which Commission resolution is required." 26 FCC Rcd at 5337 (¶ 218).

For these reasons, the Court should carefully consider the impact of its ruling not just because of the effect on the immediate parties to this dispute but more broadly for the precedent it will set for other municipalities across the country in this area of regulation.

II.   **LOUISVILLE METRO MISCONSTRUES RELEVANT CASE LAW IN ARGUING THAT THE COURT SHOULD DISMISS THE FIRST CAUSE OF ACTION SEEKING DECLARATORY JUDGMENT THAT THE ORDINANCE IS PREEMPTED**

Of all the arguments advanced by Louisville Metro to dismiss the Complaint, the one with the most widespread implications for Frontier and other ILECs throughout the country is the contention that AT&T does not have the right to a declaratory judgment from this Court as to whether the Ordinance is preempted pursuant to the Pole Attachment Act. Louisville Metro appears to argue that no federal court has jurisdiction in an action brought by a private party to decide whether a local law conflicts with the Pole Attachment Act and implementing regulations of the FCC or state regulation. Louisville Metro's position is baseless. In fact, the very cases cited by Louisville Metro demonstrate the invalidity of its argument.

Louisville Metro relies upon *Kansas City Power and Light Co. v. American Fiber Systems, Inc.*, No. 03-23300-GTV, 2003 U.S. Dist. LEXIS 20983 (D. Kan. Nov. 5, 2003) ("*Kansas City Power*"), and *Virginia Electric and Power Co. v. Comcast of Virginia, Inc.*, No. 1:09cv1149(JCC), 2010 U.S. Dist. LEXIS 21441 (D. Va. Mar. 8, 2010) ("*Virginia Electric*"). But the holdings in those cases that the plaintiff had no private right of action pertained to claims for ***monetary damages*** under the Pole Attachment Act, not a claim invoking the equitable power of the Court for a ruling under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, as to the preemptive effect of the Act and implementing regulations.

The plaintiff in *Kansas City Power*, a utility company, filed a declaratory judgment action and sought injunctive relief against American Fiber Systems, Inc. ("AFS") for the court to construe

whether AFS constituted a telecommunications carrier under the Pole Attachment Act. In response AFS brought two counterclaims: one for its own declaratory judgment and a second to recover damages against the utility company for violating the Pole Attachment Act. The utility company moved to dismiss AFS's *second* counterclaim (the one for monetary relief), arguing that Congress did not intend the Pole Attachment Act "to create a private right of action *for damages*." *Id.* at *4 (emphasis added). The court agreed, dismissing the damages counterclaim, but notably did ***not*** hold that declaratory and injunctive relief is unavailable with respect to the preemptive effective of the Pole Attachment Act and implementing regulations. Indeed, the *Kansas City Power* court was not even presented with a preemption claim, as there was no local law at issue that was in conflict with the Act or any implementing regulation.

Similarly, the court in *Virginia Electric* addressed only the availability of ***damages*** in an action between private parties under the Pole Attachment Act, not the preemption issues presented here. Indeed, the *Virginia Electric* court cited the portion of the *Kansas City Power* opinion that dealt only with the ***damages*** counterclaim, holding there was no private right of action under the Pole Attachment Act for payments relating to rental of a network of electricity poles. The *Kansas City Power* court was not asked to adjudicate preemption of any local law.

Moreover, Louisville Metro's argument ignores that in *Kansas City Power*, the court chose not to extend its analysis to the parties' declaratory judgment claims. After dismissing the damages counterclaim, the court considered whether it was necessary to refer the declaratory judgment claims to the FCC under the doctrine of primary jurisdiction.[5] Primary jurisdiction doctrine is

---

[5] The primary jurisdiction doctrine "requires the court to enable a referral to the agency, staying further proceedings as to give the parties reasonable opportunity to seek an administrative ruling." *Id*. (internal quotations omitted). "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular

"specifically applicable to claims ***properly cognizable in court*** that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (emphasis added). By invoking the primary jurisdiction doctrine, the *Kansas City Power* court thus recognized that it ***did*** have jurisdiction to analyze claims for declaratory and injunctive relief to enforce and construe the Pole Attachment Act. However, based on the specific facts in the case, including the parties' reliance on prior FCC decisions and the fact that the question at issue was already pending before the FCC, the *Kansas City Power* court ultimately determined to abstain from hearing the claim based upon the doctrine of primary jurisdiction. Thus, rather than support Louisville Metro's argument to dismiss, *Kansas City Power* in fact confirms that this Court does have jurisdiction over AT&T's claim for declaratory relief.

Furthermore, unlike in the particular circumstances of *Kansas City Power,* abstention under the primary jurisdiction doctrine is not warranted in this case. The federal law claim before this Court – whether the Ordinance is preempted by regulations implementing the Pole Attachment Act – is not pending before the FCC, nor is it an issue expected to be ruled upon by that federal agency.

The Supreme Court's recent decision in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), does not change this analysis. *Armstrong* held simply that there is no implied right of action under the Supremacy Clause of the U.S. Constitution and Congress intended to preclude a private right of action to enforce section (30)(A) of the Medicaid Act. The *Armstrong* Court did not change the longstanding rule of equity that "[a] plaintiff who seeks injunctive relief

---

litigation." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996).

from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).[6] Although the *Armstrong* Court clarified that the Supremacy Clause itself does not supply a private right of action, a party's ability to enjoin a public officer in federal court is a separate and distinct equitable remedy. *See Armstrong*, 135 S. Ct. at 1384. This equitable relief to enforce federal law traditionally remains available unless and until Congress displaces it. *Id.* at 1385-86. "To say that the Supremacy Clause does not confer a right of action is not to diminish the significant role that courts play in assuring the supremacy of federal law." *Id.* at 1384.[7] *Armstrong* has not changed the general rule that federal courts have equitable jurisdiction over suits to enjoin local officials from interfering with rights established by federal law, provided Congress has not displaced this judicial authority.

    To determine whether there is a valid equitable cause of action to enforce a federal law's preemptive effect, this Court should consider whether Congress expressly or implicitly precluded the federal law's private enforcement in this regard. *See Armstrong*, 135 S. Ct. at 1385. The

---

[6] *See also Foster v. Love,* 522 U.S. 67 (1997) (federal court jurisdiction existed to hold that a federal election statute preempted a conflicting state election law); *Railroad Transfer Service, Inc. v. Chicago,* 386 U.S. 351 (1967) (federal court jurisdiction existed to hold that federal Interstate Commerce Act preempted conflicting city ordinance); *Campbell v. Hussey,* 368 U.S. 297 (1961) (federal court jurisdiction to hold federal Tobacco Inspection Act preempted conflicting state labeling law); *Railway Co. v. McShane,* 89 U.S. 444 (1874) (federal court jurisdiction existed to hold that federal statute preempted state tax law).

[7] *See also Cruz v. Abbott*, No. 5:16-CV-067-DAE, 2016 WL 1463983, at *10 (W.D. Tx. Apr. 16, 2016) (citing *Armstrong* the court held that "[w]hile Plaintiffs do not have a private right of action under the Supremacy Clause to bring their preemption claims, they may, contrary to Defendants' contention, bring their suit in equity to enjoin an unconstitutional action. . . . Accordingly, Plaintiffs have a right of action in equity to bring their claims under the Supremacy Clause against Defendants"); *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301 (D. Az. 2015) (similarly finding an equitable private right of action for a federal preemption claim).

Supreme Court declined to exercise its equitable power in *Armstrong* because it concluded that Congress intended to preclude all private enforcement of section (30)(A) of the Medicaid Act. Not only was there significant complexity associated with enforcing the particular provision at issue, but also Congress had created a broad administrative remedy under the Medicaid Act for the very wrong about which the plaintiffs were complaining. *See id.*

In contrast, the Pole Attachment Act provides for no comparable remedy whereby any federal agency may provide relief from local mandates that conflict with regulations under the Pole Attachment Act. Instead, the Act, as noted, permits the FCC (where reverse preemption does not apply) to "regulate the rates, term and conditions for pole attachments" and to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms and conditions." The Act thus simply directs the FCC in these circumstances to adopt procedures necessary and appropriate to hear and resolve complaints concerning pole attachment rates, terms and conditions. The statute does not delegate to the FCC, expressly or implicitly, authority to decide preemption issues as applied to conflicting local laws.[8]

AT&T is asserting federal preemption and challenging the validity of a local ordinance; it is not asking for any of the specific relief granted under section 224(b)(1), that is, any particular rate, term or condition for pole attachment. Thus, the FCC has no jurisdiction or even unique expertise to decide the preemption question presented to this Court.

---

[8] The FCC's responsibilities under the Act include, where state regulation under reverse preemption does not apply, addressing pole attachment complaints if a particular rate, term or condition is unjust or unreasonable, and providing guidance regarding the Commission's approach to evaluating those complaints and what the appropriate rate may be. *See* Pole Attachment Order, 6 FCC Rcd at 5245. Notably, the FCC has never recognized that it has authority under the Act to determine issues regarding preemption of local ordinances that conflict with implementing regulations under the Act.

The relevant issue presented here, therefore, is not whether Congress intended to preclude a private party such as AT&T from obtaining a particular monetary remedy under the Pole Attachment Act – the issues in *Kansas City Power* and *Virginia Electric* – but rather whether Congress barred a private party from obtaining a court's judgment in equity to restrain a local law that is preempted by implementing regulations pursuant to that Act.[9] There is nothing in the statute, explicitly or implicitly, indicating that Congress intended to displace private claims in equity for judicial review of whether a local law is preempted by the Pole Attachment Act and implementing regulations. Thus, this Court should reject Louisville Metro's argument that this Court has no equitable jurisdiction to decide whether the Ordinance is preempted.

## Conclusion

For the foregoing reasons, this Court should give close consideration to the concerns of Frontier and others around the country seeking uniform enforcement of the Pole Attachment Act and implementing regulations. The Court should deny Louisville Metro's Motion to Dismiss the Complaint and hear AT&T's claim for declaratory and injunctive relief that the Ordinance is preempted by the Pole Attachment Act.

---

[9] Thus, Louisville Metro's reliance on *Michigan Corrections Organization v. Michigan Department of Corrections*, 774 F.3d 895, 905 (6th Cir 2014) (recognizing that the absence of an express cause of action under a statute strongly suggests no implied cause of action under that statute either), is beside the point. AT&T is not seeking to bring an express or implied claim under the Pole Attachment Act. Rather, AT&T's claim invokes the Court's inherent equitable powers, which exist apart from any statute, to declare unenforceable a local law that is preempted by regulations implementing federal law.

Respectfully submitted,


/s/ John K. Bush
John K. Bush
Bingham Greenebaum Doll LLP
3500 National City Tower
101 South Fifth Street
Louisville, KY 40202
502.589.4200/502.587.3695 (fax)
jbush@bgdlegal.com

-and-

Lauren R. Nichols
Bingham Greenebaum Doll LLP
300 W. Vine Street, Ste 1200
Lexington, KY 40507
859.231.8500/859.255.2742 (fax)
lnichols@bgdlegal.com

COUNSEL FOR *AMICUS CURIAE*
FRONTIER COMMUNICATIONS CORPORATION


## CERTIFICATE OF SERVICE

I hereby certify that on June 24th , 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve notice electronically on all counsel of record.

/s/ John K. Bush
COUNSEL FOR *AMICUS CURIAE*
FRONTIER COMMUNICATIONS CORPORATION

17457531_3.docx