IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

BELLSOUTH TELECOMMUNIATIONS, LLC,                           Plaintiff

v.                                              Case No. 3:16-CV-124-TBR

LOUISVILLE/JEFFERSON COUNTY METRO
GOVERNMENT,                                          Defendant

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Louisville/Jefferson County Metro Government's motion to dismiss. (DN 27). Plaintiff BellSouth Telecommunications, LLC has responded. (DN 30). Frontier Communications Corporation has filed an *amicus curiae* brief. (DN 31-2). Defendant has replied. (DN 36). For the following reasons, Defendant's motion to dismiss (DN 27) is DENIED.

BACKGROUND

This case arises out of a recently passed ordinance which amends regulations governing who may work on utility poles in Louisville, Kentucky. Plaintiff BellSouth Telecommunications, LLC, doing business as AT&T Kentucky ("AT&T") is a telecommunications carrier which provides service in Louisville. AT&T has invested millions of dollars to construct and maintain a communication network in Louisville. A significant portion of this network "consists of aerial telephone lines and associated equipment placed upon utility poles in the public rights-of-way." (DN 1). The majority of these utility poles are owned by Louisville Gas and Electric ("LG&E") or by AT&T itself.

Chapter 116 of the Louisville Metro Code of Ordinances contains regulations for the construction, maintenance, and operation of cable communications systems. On February 11, 2016, Defendant Louisville/Jefferson County Metro Government ("Louisville Metro") adopted

an ordinance which amended these regulations. (DN 1-2). The ordinance permits a third-party, called an "Attacher,"[1] to "relocate or alter the attachments or facilities of any Pre-Existing Third Party User[2] as may be necessary to accommodate Attacher's Attachment." (DN 1-2). The Attacher must use contractors approved by the Pole Owner,[3] which may be different from those approved by the Pre-Existing Third Party User. Furthermore, the Attacher may perform this work without prior notice to the Pre-Existing Third Party User if the work would not reasonably be expected to cause a customer outage. The Attacher must notify the Pre-Existing Third Party User within thirty days after completion of the work. The Pre-Existing Third Party User then has fourteen days to inspect the work.

AT&T raises several concerns with the effect of this ordinance. The ordinance permits an Attacher to alter AT&T's property without AT&T's consent. If this disrupted AT&T's network, AT&T may have difficulty locating and correcting the disruption because it had no prior notice of the alteration. Although this scenario is ostensibly protected against by the requirement that an Attacher give prior notice if a customer outage is expected, AT&T does not have a role in making this assessment and questions a third-party's ability to accurately do so. AT&T also notes that the fourteen-day inspection period is insufficient. If, as anticipated, a

---

[1] "Attacher" is defined as "Any person, corporation, or other entity or their agents or contractors seeking to permanently or temporarily fasten or affix any type of equipment, antenna, line or facility of any kind to a utility pole in the right of way or its adjacent ground space." (DN 1-2).

[2] "Pre-Existing Third Party User" is defined as "The owner of any currently operating facilities, antenna, lines or equipment on a pole or its adjacent ground space in the right of way." (DN 1-2).

[3] "Pole Owner" is defined as "A person, corporation or entity having ownership of a pole or similar structure in the right of way to which utilities, including without limitation, electric and communications facilities, are located or may be located whether such ownership is in fee simple or by franchise." (DN 1-2).

prolific Attacher such as Google Fiber began operating in Louisville, then AT&T would need to hire additional employees to handle the flood of inspections that would result. (DN 30).

Two parties have requested leave to appear in this case as *amicus curiae*. Frontier Communications Corporation ("Frontier") is also a telecommunications company. Although Frontier does not operate in Kentucky, it believes that other cities may enact ordinances similar to the ordinance enacted by Louisville Metro. (DN 31-2). Communications Workers of America ("CWA") is a labor organization which represents employees in the telecommunications field. CWA and AT&T are parties to a collective bargaining agreement which reserves certain work to employees represented by CWA. CWA believes the ordinance may permit third-parties to perform this work in conflict with the terms of that collective bargaining agreement. (DN 15).

AT&T asserted three claims in this action. Before the Court is Louisville Metro's motion to dismiss all three claims. (DN 27).

STANDARD

"When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (*citing Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)). Denial of the motion is proper "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir. 1989) (*citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Nonetheless, unwarranted factual inferences or legal conclusions masquerading as fact will not prevent a motion to dismiss. *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). A "complaint must contain either direct or inferential allegations respecting all the material

elements to sustain a recovery under some viable legal theory." *Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997) (*citing In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)).

DISCUSSION

AT&T has asserted three claims. First, AT&T asserts the ordinance is preempted by federal law, 47 U.S.C. § 224, and "the pole attachment regulations promulgated" by the Federal Communications Commission ("FCC" or "Commission"). (DN 1). Second, AT&T claims that Kentucky law grants the Public Service Commission of Kentucky ("PSC") exclusive authority to regulate utility pole attachments. Third, AT&T claims Louisville Metro has exceeded its authority as a first class city by passing an ordinance which conflicts with state law. (DN 1).

Louisville Metro has moved to dismiss all three of AT&T's claims. Louisville Metro argues 47 U.S.C. § 224 does not provide a private cause of action for AT&T to pursue its first claim. Louisville Metro argues this Court lacks subject matter jurisdiction over AT&T's second and third claims. (DN 27). The Court will address whether (I) federal law provides AT&T with a cause of action to assert its first claim before turning to whether (II) this Court has subject matter jurisdiction to decide AT&T's second and third claims.

I. **Cause of Action.**

AT&T's first claim is that the ordinance passed by Louisville Metro is preempted by 47 U.S.C. § 224. (DN 1). Louisville Metro moves to dismiss this claim on the grounds that 47 U.S.C. § 224 does not confer a private cause of action. AT&T responds that this Court may nevertheless exercise equitable jurisdiction over this dispute. The Court finds that (A) 47 U.S.C. § 224 does not create a private cause of action; and (B) the Court may properly exercise equitable jurisdiction to enjoin Louisville Metro's allegedly preempted conduct.

4

## A. 47 U.S.C. § 224 Does Not Create a Private Cause of Action.

"The Pole Attachments Act, 92 Stat. 35, as amended, 47 U. S. C. § 224, was enacted by Congress as a solution to a perceived danger of anticompetitive practices by utilities in connection with cable television service." *F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 247 (1987). "Since the inception of cable television, cable companies have sought the means to run a wire into the home of each subscriber." *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 330 (2002). "They have found it convenient, and often essential, to lease space for their cables on telephone and electric utility poles." *Id*. "Utilities, in turn, have found it convenient to charge monopoly rents." *Id*. "In response to arguments by cable operators that utility companies were exploiting their monopoly position by engaging in widespread overcharging, Congress in the Pole Attachments Act authorized the Federal Communications Commission to fill the gap left by state systems of public utilities regulation." *Florida Power Corp.*, 480 U.S. at 247-48. "The Act provides that any cable company[4] operating in a State which does not regulate the rates, terms, and conditions of pole attachments may seek relief from alleged overcharging before the Commission, which is empowered to 'regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable. . . .'" *Id*. at 248 (*quoting* 47 U.S.C. § 224(b)(1)).

The Pole Attachment Act does not expressly create a private cause of action. Two federal courts have previously been asked to determine whether the Pole Attachment Act impliedly creates a private cause of action. Both have found that it does not. *Kan. City Power & Light Co. v. Am. Fiber Sys., Inc.*, 2003 WL 22757927, 2003 U.S. Dist. LEXIS 20983 (D. Kan.

---

[4] Congress expanded the Pole Attachment Act's coverage to include "provider[s] of telecommunications service" such as AT&T when it passed the Telecommunications Act of 1996.

Nov. 5, 2003); *Va. Elec. & Power Co. v. Comcast of Va., Inc.*, 2010 WL 916953, 2010 U.S. Dist. LEXIS 21441 (E.D. Va. Mar. 8, 2010). The *Kansas City Power* court first noted that a "plaintiff asserting an implied right of action under a federal statute bears the relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the statute." 2003 WL 22757927, at *2 (*quoting Med. Supply Chain, Inc. v. U.S. Bancorp, NA*, 2003 WL 21479192, at *8 (D. Kan. June 16, 2003)). It then examined the legislative history of the Pole Attachment Act to look for evidence that Congress impliedly intended to create a private cause of action. In doing so, it found the Pole Attachment Act "was intended to serve two specific purposes: (1) 'To establish a mechanism whereby unfair pole attachment practices may come under review and sanction'; and (2) 'to minimize the effect of unjust or unreasonable pole attachment practices on the wider development of cable television service to the public.'" *Id*. (*quoting* S. Rep. No. 95-580, at 14 (1978), *reprinted in* 1978 U.S.C.C.A.N. 109, 122). To accomplish these goals, "Congress commanded the FCC to establish a regulatory scheme to settle pole attachment disputes." *Id*. at *3. However, "Congress remained silent on the availability of a private right of action for damages under the Pole Attachment Act," both in initially passing the Act and in passing several amendments to the Act. *Id*. "When Congress wishes to provide a private remedy, it knows how to do so." *Id*. (*quoting Brown v. Am. Home Prods. Corp.*, 520 F. Supp. 1120, 1128 (D. Kan.1981)). The *Kansas City Power* court found that Congress's silence as to the availability of a private cause of action showed that Congress did not intend to create a private cause of action.

Seven years later, the *Virginia Electric* court adopted the rationale of the *Kansas City Power* court. *Va. Elec. & Power Co.*, 2010 WL 916953, at *4. ("There, as here, the Court 'is reluctant to imply a cause of action without evidence of congressional intent' and will not create

6

an implied private cause of action under § 224 alone."). These two cases appear to be the only cases addressing this issue. AT&T does not argue that these cases are incorrect or that the Pole Attachment Act creates an implied cause of action. Instead, AT&T requests this Court exercise equitable jurisdiction over this dispute.

### B. Equitable Power.

Federal courts have equitable jurisdiction to enjoin government action that would violate federal law. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally"). A party may invoke a federal court's equitable jurisdiction even when no private cause of action exists. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015). The Supreme Court recently addressed this area of law in *Armstrong*. However, the parties disagree on the interpretation of *Armstrong*. Before turning to *Armstrong*, the Court will briefly discuss the history of equitable jurisdiction.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*; *accord Hadix v. Johnson*, 144 F.3d 925, 937 (6th Cir. 1998) (explaining "[c]ertain inherent powers of the courts," such as the "authority to issue injunctive relief," are "'rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court.'" (citation omitted)). In addition, the Second Congress "provided specially for the exercise of equitable remedial powers by federal courts." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 404 (1971) (Harlan, J., concurring) (*citing* Act of May 8, 1792, § 2, 1 Stat. 276).

An early example of federal courts exercising equitable jurisdiction is found in *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, (1824). The *Osborne* case arose after Ohio passed a tax directed at the Bank of the United States. Chief Justice Marshall affirmed that the federal government had authority to incorporate the Bank. *Id*. at 860 (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)). The *Osborne* court held that "[i]f the trade of the Bank be essential to its character, as a machine for the fiscal operations of the government, that trade must be as exempt from State control," including state taxes. *Id*. at 867. Therefore, if a state seeks to tax the Bank in violation of this principle, "it is the province of a Court of equity, in such cases, to arrest the injury, and prevent the wrong." *Id*. at 845.

Eighty years after *Osborne* the Supreme Court decided *Ex parte Young*, 209 U.S. 123 (1908). That case arose after Minnesota passed laws which set rates for rail travel. Minnesota also established stiff criminal penalties for any railroad company or its officers who set rates in violation of those established by Minnesota. Stockholders in the Northern Pacific Railway Company filed suit claiming Minnesota's laws violated the Due Process Clause of the Fourteenth Amendment. Edward Young, attorney general for Minnesota, argued that federal courts lacked jurisdiction over the dispute. The Supreme Court, after reviewing its decisions on equitable jurisdiction since *Osborne*, held:

> The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

*Id*. at 155-56.

Following *Ex parte Young*, courts began to grapple with a new question: Under what circumstances could a federal court exercise equitable jurisdiction? The Supreme Court provided an expansive answer: "Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). "Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960) (*quoting Porter*, 328 U.S. at 398). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (*quoting Porter*, 328 U.S. at 398).

The most prominent exception to the above rule is found in the Supreme Court's decision in *Seminole Tribe v. Florida.*, 517 U.S. 44 (1996). The *Seminole Tribe* case arose after Congress passed the Indian Gaming Regulatory Act, which provided that "an Indian tribe may conduct certain gaming activities only in conformance with a valid compact between the tribe and the State in which the gaming activities are located." *Id*. at 47. The Act required States to negotiate compacts in good faith and expressly authorized tribes to sue States in federal court to compel negotiation. The Supreme Court held Congress had exceeded its authority in abrogating States' immunity from suit provided by the Eleventh Amendment. *Id*. at 72. It also held that *Ex parte Young* did not provide jurisdiction to seek equitable relief because the Act contained a "detailed remedial scheme" which demonstrated Congress's intent to limit other remedies, such as injunctive relief. *Id*. at 74 ("[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting

9

aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."). Following *Seminole Tribe*, courts began adopting the "detailed remedial scheme" test. *See e.g. Westside Mothers v. Haveman*, 289 F.3d 852, 862 (6th Cir. 2002); *Marie O. v. Edgar*, 131 F.3d 610, 616 (7th Cir. 1997).

Last year, the Supreme Court decided *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). The *Armstrong* Court was asked to consider whether Medicaid providers could sue to enforce Section (30)(A) of the Medicaid Act. The *Armstrong* Court first held that no private cause of action existed. It then turned to whether federal courts could address this question in equity. It explained the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id*. at 1385. It then found that "[t]wo aspects of § 30(A) establish Congress's 'intent to foreclose' equitable relief." *Id*. (citation omitted). The text of Section 30(A) was "judicially unadministrable." *Id*. Furthermore, "the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements—for the State's 'breach' of the Spending Clause contract—is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id*. (citing 42 U.S.C. § 1396c). The Supreme Court clarified that the combination of both factors was necessary to conclude that Congress intended to "preclude[] private enforcement of § 30(A) in the courts." *Id*.

Other than stating these two factors, the *Armstrong* Court did not provide a general test for courts analyzing whether claims of equitable jurisdiction were impliedly foreclosed by Congress. In his concurrence, Justice Breyer found there was no "simple, fixed legal formula separating federal statutes that may underlie this kind of injunctive action from those that may not." *Id*. at 1388 (Breyer, J., concurring). In her dissent, Justice Sotomayor criticized the

majority for reaching its decision "without pointing to the sort of detailed remedial scheme we have previously deemed necessary to establish congressional intent to preclude resort to equity." *Id*. at 1390 (Sotomayor, J., dissenting). Justice Sotomayor also acknowledged that Congress could "either expressly or implicitly preclude *Ex parte Young* enforcement," but argued that "because Congress is undoubtedly aware of the federal courts' long-established practice of enjoining preempted state action, it should generally be presumed to contemplate such enforcement unless it affirmatively manifests a contrary intent."[5] *Id*. at 1392.

It is unclear whether *Armstrong* states a new test for equitable jurisdiction cases or merely restates a well-established principle, albeit in slightly different terms.[6] Nor is this answer clear from the limited cases that have cited *Armstrong*. Several cases do apply *Armstrong* and, in doing so, look for congressional intent to impliedly foreclose equitable jurisdiction. *See e.g. Smith v. Hickenlooper*, 2016 WL 759163, at *1 (D. Colo. Feb. 26, 2016) (holding the court did not have equitable jurisdiction over state law enforcement officers' claim that Colorado's legalization of marijuana violated the Controlled Substances Act because enforcement of the CSA was delegated to the Attorney General); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 2015 WL 3936346, at *9 (E.D.N.Y. June 26, 2015); *Barry v. Lyon*, 2015 U.S. Dist. LEXIS 174347 (E.D. Mich. June 5, 2015). However, several cases cite to *Armstrong* as simply

---

[5] The Supreme Court has previously adopted this position. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles.").

[6] There is overlap between *Armstrong*'s statement that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," 135 S. Ct. at 1385, and *Porter*'s statement that "[u]nless a statute in so many words, *or by a necessary and inescapable inference*, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." 328 U.S. at 398 (emphasis added).

11

affirming the traditional understanding that a federal court may enjoin unconstitutional acts, doing so without looking for congressional intent to foreclose equitable relief.[7] *Strawser v. Strange*, 105 F. Supp. 3d 1323, 1330 (S.D. Ala. 2015), *aff'd* 2015 U.S. App. LEXIS 23018 (11th Cir. Oct. 20, 2015) (holding court had equitable jurisdiction to declare Alabama law discriminating against same-sex marriage was unconstitutional); *Cruz v. Abbott*, 2016 WL 1463983 (W.D. Tex. Apr. 14, 2016) (holding plaintiffs could bring a right of action in equity when they challenged a Texas law which criminalized harboring an undocumented alien because it was preempted by federal law); *Va.Uranium, Inc. v. McAuliffe*, 147 F. Supp. 3d 462, 468 n. 6 (W.D. Va. 2015).

Under the latter set of cases, this Court's analysis is direct. "The court considers whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized

---

[7] A possible explanation is that parties seeking negative relief are treated differently than those seeking affirmative relief. *Private Rights of Action-Equitable Remedies to Enforce the Medicaid Act-Armstrong v. Exceptional Child Center, Inc.*, 129 Harv. L. Rev. 211, 220 (2015) ("[T]he majority [in *Armstrong*], by not calling the Court's previous reading of *Ex parte Young* into question, suggests that the displacement of negative injunctions demands a more robust showing of congressional intent.").

"[A]ffirmative relief makes a demand for damages or specific performance of a duty," whereas negative relief "seeks to nullify a challenged action or law and makes no demand other than to be let alone." *Id.* (citation omitted). The Sixth Circuit has previously recognized this distinction. "Private parties who act in compliance with federal law may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws." *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (emphasis in original) ("That makes sense, because an existing cause of action for that relief exists: an equitable anti-suit injunction."). "But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*." *Id.* (emphasis in original) ("When courts dismiss such actions, it usually is because the relief sought, though styled as prospective injunctive relief against a state official, in reality runs against the State or in reality is retroactive and monetary in nature."); *see also W. Air Lines, Inc. v. Port Auth. of New York & New Jersey*, 817 F.2d 222, 226 (2d Cir. 1987).

as prospective." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474 (6th Cir. 2008) (citation and punctuation omitted); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) ("[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."). AT&T asks this Court to enjoin Louisville Metro from enforcing an ordinance that AT&T claims conflicts with 47 U.S.C. § 224 and regulations promulgated by the FCC. AT&T claims it will suffer irreparable harm if an injunction is not issued. Thus, AT&T invokes this Court's equitable jurisdiction to enjoin a state act which violates federal law—a claim traditionally in line with *Ex parte Young*.

This answer does not change if the Court need look for congressional intent to foreclose equitable relief. AT&T seeks to enjoin Louisville Metro from violating 47 U.S.C. § 224, which authorizes the Federal Communications Commission to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable," and requires the Commission to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions." 47 U.S.C. § 224(b). The Commission's authority is supplanted in any State which chooses to regulate "such rates, terms, and conditions," provided that State meets certain requirements. *Id*. § 224(c). Unlike in *Armstrong*, 47 U.S.C. § 224 does not provide a "sole remedy." *Armstrong*, 135 S. Ct. at 1385. Nor does the Pole Attachment Act display a "carefully crafted and intricate remedial scheme" which would demonstrate Congressional intent to foreclose equitable relief. *Seminole Tribe*, 517 U.S. at 73-74. This is illustrated by a comparison to the remedial scheme in *Seminole Tribe*:

> the intricate procedures set forth in that provision show that Congress intended therein not only to define, but also to limit significantly, the duty imposed by § 2710(d)(3). For example, where the court finds that the State has failed to negotiate in good faith, the only remedy prescribed is an order directing the State and the Indian tribe to conclude a compact within 60 days. And if the parties disregard the court's order and fail to conclude a compact within the 60–day

> period, the only sanction is that each party then must submit a proposed compact to a mediator who selects the one which best embodies the terms of the Act. Finally, if the State fails to accept the compact selected by the mediator, the only sanction against it is that the mediator shall notify the Secretary of the Interior who then must prescribe regulations governing class III gaming on the tribal lands at issue.

*Id*. To the extent the Pole Attachment Act does describe remedies, they are either inapplicable, 47 U.S.C. § 207 (permitting any person "damaged by any common carrier" to make a complaint to the Commission or bring suit, but not both), or vaguely referenced. 47 U.S.C. § 224(b) (requiring the Commission to "adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions.").

Furthermore, this Court finds it persuasive that the Supreme Court has previously reviewed the Telecommunications Act of 1996 and found it does not "display any intent to foreclose jurisdiction under *Ex parte Young*." *Verizon*, 535 U.S. at 638 (2002). The Supreme Court's interpretation of the Telecommunications Act of 1996 is influential because the Telecommunications Act of 1996 was an amendment to the Pole Attachment Act. AT&T falls under the ambit of the Pole Attachment Act because of the Telecommunications Act of 1996, which expanded the Pole Attachment Act's coverage to include "provider[s] of telecommunications service." Pub. L. No. 104–104, 110 Stat. 56. While the Pole Attachment Act has distinguishing features, the Court finds the *Verizon* Court's analysis persuasive because it distinguished itself from *Seminole Tribe* on the grounds that the Telecommunications Act of 1996 did not "impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*." *Verizon*, 535 U.S. at 647 (quoting *Seminole Tribe*, 517 U.S. at 75. Likewise, this Court finds no congressional intent in

14

the Pole Attachment Act to significantly limit liability. For the foregoing reasons, the Court finds that it has equitable jurisdiction to hear AT&T's first claim.

## II. Subject Matter Jurisdiction.

AT&T's second claim is that Kentucky law grants the Public Service Commission of Kentucky ("PSC") exclusive authority to regulate utility pole attachments. AT&T's third claim is that Louisville Metro has exceeded its authority as a first class city by passing an ordinance which conflicts with state law. Louisville Metro moves to dismiss both claims on the grounds that this Court lacks subject matter jurisdiction over these claims.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994). "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Id*. (citation omitted). "It is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id*. (*citing Turner v. Bank of North-America*, 4 U.S. 8 (1799); *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)). Of course, "a federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002); *McNutt v. Sanders*, 2011 U.S. Dist. LEXIS 85731, at *3 (W.D. Ky. 2011) (citation omitted); *see also* Fed. R. Civ. P. 12(h)(3). Furthermore, once a federal court determines it has jurisdiction, it generally must exercise that jurisdiction. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358 (1989) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."); *Ala. Public Serv. Comm'n v. S. R. Co.*, 341 U.S. 341, 361 (1951) ("[I]t was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it.").

15

"In order to provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction in federal-question cases—civil actions that arise under the Constitution, laws, or treaties of the United States." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (*citing* 28 U.S.C. § 1331). "In order to provide a neutral forum for what have come to be known as diversity cases, Congress also has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens." *Id.* (*citing* 28 U.S.C. § 1332). "[O]nce a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." *Id.*; *see also* 28 U.S.C. § 1367.

"Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). "For diversity jurisdiction, 28 U.S.C. § 1332 requires that the 'matter in controversy exceed . . . the sum or value of $ 75,000, exclusive of interest and costs.'" *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 572 (6th Cir. 2001); *see also Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 376 (6th Cir. 2007) (including attorneys' fees where provided for by agreement). "The amount in controversy for federal diversity jurisdiction purposes is determined as of the time the action is commenced." *Worthams v. Atlanta Life Ins. Co.*, 533 F.2d 994, 997 (6th Cir. 1976). "The general rule is that the amount claimed in good faith by the plaintiff controls unless it appears to a legal certainty that the claim is for less than the jurisdictional amount or unless the amount claimed is merely colorable." *Sellers v. O'Connell*, 701 F.2d 575, 578 (6th Cir. 1983). "It is sufficient if there is a probability that the value of the matter in controversy exceeds the jurisdictional amount." *Id.*;

*see also Worthams*, 533 F.2d at 997 (citation omitted). "But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed." *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 628 (6th Cir. 2009) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)); see *e.g. Mitchell v. United Parcel Servs.*, No. 5:14CV-203-R, 2014 WL 6882267, at *2 (W.D. Ky. Dec. 4, 2014) ("Plaintiff sues United Parcel Services on the basis that it did not deliver her Avon cosmetics order to the correct address . . . . [T]he Court concludes that it is apparent to a legal certainty that her out-of-pocket losses for the missing Avon products does not exceed $75,000.").

"Where injunctive relief is requested, the value of the relief for purposes of the amount in controversy requirement is the value of the object of the litigation measured from the plaintiff's perspective, that is, the monetary value of the benefit that would flow to the plaintiff if the injunction were granted." *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 675 (S.D. Ohio 2003) (citation omitted); *see also Northup Properties, Inc. v. Chesapeake Appalachia, L.L.C.*, 567 F.3d 767, 770 (6th Cir. 2009) ("One principle is well-settled: for actions seeking a declaratory judgment, we measure the amount in controversy by 'the value of the object of the litigation.'") (*quoting Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).

In its complaint, AT&T claims this Court has diversity jurisdiction over this case because AT&T is a citizen of Delaware and Texas while Louisville Metro is a citizen of Kentucky and the amount in controversy exceeds $75,000. Specifically, AT&T alleges that the "economic value of the rights AT&T seeks to protect exceeds $75,000, and if relief is denied AT&T will suffer losses in excess of $75,000." (DN 1). AT&T claims that it has "invested millions of

17

dollars" to maintain facilities "on over one hundred thousand poles in the Louisville Metro area." (DN 30). A single disruption could cause loss of service to over 1,000 customers, and accordingly, a loss of goodwill. The replacement of a single severed fiber optic cable could cost over $75,000 as the entire section of cable would need to be replaced. (DN 30). The Court finds that AT&T has pled in good faith an amount in controversy which exceeds $75,000.

Louisville Metro moves to dismiss on the grounds that these "conclusory allegations supporting diversity jurisdiction are insufficient." (DN 27). Louisville Metro argues that AT&T's jurisdictional claims should be held to the pleading standard stated in Fed. R. Civ. P. 8(a) and explained in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). AT&T correctly points out that *Iqbal* and *Twombly* do not apply to a plaintiff's claim regarding the amount in controversy. Instead, it must appear to a "legal certainty" that plaintiff's claim does not exceed $75,000. *Sellers*, 701 F.2d at 579 (6th Cir. 1983) ("as a legal certainty, appellant was only entitled to $9,875 in benefits"); *see also Wells v. Ins. Co. of N. Am.*, 452 F. Supp. 304, 305 (E.D. Tenn. 1978). Moreover, it is immaterial that AT&T may ultimately fail to recover relief which exceeds $75,000 in value. *St. Paul Mercury*, 303 U.S. at 288-89 ("The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction."). Nor can the Court accept Louisville Metro's argument that the ordinance will not cause a risk of loss to AT&T that exceeds $75,000.[8] *EQT Gathering, LLC v. Webb*, 2014 WL 1577055, at *3 (E.D. Ky. 2014)

---

[8] Louisville Metro claims this Court may decide factual issues in dispute and urges this Court to construe the affidavit AT&T submitted in support of its position against AT&T. The Court declines to do so for two reasons. First, while it is true that "the district court is empowered to resolve factual disputes when necessary to resolve challenges to subject matter jurisdiction," the cases standing for this proposition are not amount-in-controversy cases. *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). The Court will not ignore clear guidance on

("Generalized claims that the asserted amount in controversy is unverified or unproven are not enough to show 'to a legal certainty' that the value of relief is below the jurisdictional amount."). Accordingly, the Court must deny Louisville Metro's motion to dismiss AT&T's second and third claims for lack of subject matter jurisdiction.

CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Louisville Metro's motion to dismiss (DN 27) is DENIED.

cc: counsel of record

---

resolving challenges to the amount in controversy to apply broad principles regarding a general challenge to subject matter jurisdiction. Second, even if the Court must resolve factual disputes, the only evidence in the record as to the amount in controversy is AT&T's affidavit (DN 30-1), which this Court finds supports AT&T's allegation that the amount in dispute exceeds $75,000.